# UNITED STATES DISTRICT COURT

for the

District of Nebraska

FILED
US DISTRICT COURT
DISTRICT OF NEBRASKA

OCT - 9 2013

OFFICE OF THE CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Goodfellas business at 613/623 South 16th Street, Omaha, Nebraska, Ruby Venditte, Louis Venditte, and electronic equipment

)
)
)
)
)
)

Case No.  8:13MJ299

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Goodfellas business at 613/623 South 16th Street, Omaha, Nebraska, Ruby Venditte (her person), Louis Venditte (his person), cellular telephones, and electronic equipment, specifically identified in paragraphs 1, 3, 4, 6, 7 of attachment A and A-1.

located in the _____ District of _____ Nebraska _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2421 | Transportation for Illegal Sexual Activity |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Anna Brewer, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  10/9/13

City and state:  Omaha, Nebraska

*Judge's signature*

THOMAS D. THALKEN, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

### Places to Be Searched

1. Business identified as GOODFELLAS, located at 623 South 16th
   Street, Omaha, Nebraska, also identified as 613 South 16th
   Street, Omaha, Nebraska, further described as a two story
   Black colored brick building with a White sign and Red
   "GOODFELLAS" and Black "DANCERS" letters that sits North of
   Jones Street, on the East side of South 16th Street in Omaha,
   Nebraska. GOODFELLAS has a door facing the west side of the
   building.  See attached photo identified as A-1.

2. The residence located at 1526 Park Wild Avenue, Omaha,
   Nebraska, 68108, also identified to as 1526 ½ Park Wild
   Avenue, Omaha, Nebraska, 68108 Street, Omaha, Nebraska further
   described as a reddish brick house that has a piqued roof.
   The house faces East but is on the West side of Park Wild
   Avenue, Omaha, Nebraska. The house is enclosed within a black
   metal fence that has a gate in front for entry to the
   property. The front door is covered by a roof.  The second
   story that is visible from the street has two windows. The
   residence also has a detached garage to the rear. See attached
   photos identified as A-2 and A-3.

3. Person of RUBY VENDITTE, white female, date of birth
   09/01/1948.

4. Person of LOUIS VENDITTE white male, date of birth 08/04/1947.

5. Vehicles associated with LOUIS and RUBY VENDITTE to include:
   A. Red 2002 Cadillac Seville (Nebraska License plate: 1-V47)

   VIN   1G6KS54Y22U136483

   and

   B.   White 2002 Chevrolet Blazer (Nebraska License plate: TCP-

   057) VIN 1GNDT13W22K150558

6. Cellular telephones having associate numbers: (402) 612-9716
   and (402) 452-1955

7. Computers, surveillance equipment, cellphones, personal data
   assistants and other similar handheld devices with electronic
   storage capability, at the locations referenced in paragraphs
   1, 2, and 5(a) and (b).



NOVEMBER 2010  DOUGLAS COUNTY ASSESSOR

A-1

## ATTACHMENT B

### Particular Things to be Seized and Searched

Any records utilizing the following business names: GOODFELLAS, RAVANITE, Inc.,

Records, notebooks, memoranda, receipts, ledgers, photographs, lists and employee or customer information relating to Goodfellas

Books, records, lists, receipts, bank savings and loan records of deposit, statements and other bank records, letter of credit, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, lease agreements, loan records, customer account information, financial statements, other financial records,

Personnel records for employees or contractors, including personnel lists and contact information, applications, contracts, and business records pertaining to employment of personnel,

Business records for services named in the affidavit, including records of advertisements for the business names and locations.

Personal and business financial documents including documents indicating business operations and expenses, payment for services, personal and business financial transactions, bank statements, financial statements, and payment records from clients, whether received via mail, hand delivery or electronically Business and massage licenses and certifications.

Client lists, ledgers and records, including names, contact information, records of visits and client ratings.

Calendars and appointment schedules, including paper copies and records stored electronically

Cash and other negotiable instruments

38

Towels, sheets, pillow cases, lotions, oils, customer skin care products, condoms, wrappers, containers, and similar items used to service clients, and bodily fluids

Indicia of ownership and control of the premises or vehicle, including keys, photographs, utility records, lease agreements, addressed letters and envelopes and vehicle registration

Telephone records including call activity and payment records.

Contact names and telephone numbers, e-mail and mailing addresses, dates and times of contacts, attempted contacts and missed calls, sent, received and stored text messages, voice mails and e-mails, and still photographs, video and audio files, whether stored on paper or electronically in desktop computers, laptop or notebook computers, telephone answering or recording machines, or similar electronic devices

Cellular telephones, personal data assistants and other similar handheld devices bearing the telephone number(s)(402) 612-9716 and (402) 452-1955 and all data stored in such devices, including contact names and telephone numbers, e-mail and mailing addresses, dates and times of contacts, attempted contacts and missed calls, sent, received and stored text messages, voice mails and e-mails, still photographs, video and audio files, dates, appointments and other calendar information, and GPS data

Cellular telephones, personal data assistants and other similar handheld devices and its contents

Cameras, surveillance equipment, recording equipment and monitors, photographs, video recordings, including digital photographs and video stored electronically on devices such as cameras, video recorders, compact disks and DVD's, thumb drives, flash drives, hard drives and other computer hardware.

Countersurveillance equipment, and cameras, communication and relay devices and related equipment for remote video surveillance.

39

Computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes but is not limited to any data processing devices (such as central processing units, memory, typewriters, and self-contained "desktop", "laptop", or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives, and tapes, optical storage devices, transistor-like binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, network transceivers, recording equipment, RAM or ROM units, acoustic couplets, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software can be stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operation systems, applications, utilities, compilers, interpreters, and communications programs. Any and all programs necessary for the proper functioning of the computer system.

Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items. These materials include items relating to the operation of the aforementioned hardware or peripherals.

Computer passwords and other data security devices designed to restrict access to or to hide computer software, documentation, or data: including data security devices consisting of hardware (such as encryption devices), software (such as programs that

40

encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data), and programming code (such as code that creates "hot" keys which perform security related functions when activated). Encryption keys or encryption passwords, wherever stored and on whatever medium, including paper or electronic medium.

Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals. All of the above records, whether stored on paper or magnetic media, such as tape cassette, disk, diskette, or on memory storage devices, such as optical disks, programmable instruments, such as telephone, electronic address books, calculators, or any other storage media, together with indicia of use, ownership, possession or control of such records.

Based on my knowledge and training and the experience of other agents and digital forensic experts with whom I have discussed this investigation, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a. The volume of evidence. Computer storage devices (such as hard disks, sim cards, SD cards, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information or images. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data

41

stored, and it would be impractical to attempt this kind of data analysis on-site.

b. Technical requirements. Searching computer systems for criminal evidence can be a highly technical process that can require expert skills and a properly controlled environment. It is often difficult to determine the hardware and software used on a system to be searched before the search is executed, and the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. As a result, it is difficult to know prior to a search: (1) whether a specific expert or search protocol may be required; (2) if so, which expert may be qualified to analyze the system and its data; and (3) whether and what type of controlled environment may be required. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Because computer evidence can be vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that, if necessary, a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

Due to the volume of the data at issue and the technical requirements set forth above, it may be necessary that the above referenced equipment, software, data, and related instruction be seized and subsequently processed by a qualified computer specialist in a laboratory setting. Under appropriate circumstances, some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject

42

to immediate seizure as such--or whether it serves as a mere
repository for evidence, a particular device can be more
readily, quickly, and thus less intrusively, analyzed off site,
with due considerations given to preserving the integrity of the
evidence. This, in turn, is often dependent upon the amount of
data and number of discrete files or file areas that must be
analyzed, and this is frequently dependent upon the particular
type of computer hardware involved. As a result, it is
ordinarily impossible to appropriately analyze such material
without removing it from the location where it is seized. Based
upon my knowledge, training, and the experience of other law
enforcement personnel with whom I have spoken, I am aware that
searches and seizures of evidence from computers taken from the
premises commonly require agents to seize most or all of a
computer system's input/output peripheral devices, in order for
a qualified computer expert to accurately retrieve the system's
data in a laboratory or other controlled environment. Therefore,
in those instances where computers are removed from the
premises, in order to fully retrieve data from a computer
system, investigators must seize all the magnetic storage
devices as well as the central processing units (CPUs) and
applicable keyboards and monitors which are an integral part of
the processing unit. If, after it becomes apparent that these
items are no longer necessary to retrieve and preserve the data
evidence, such materials and/or equipment will be returned
within a reasonable time.

The analysis of electronically stored data, whether performed
on-site or in a laboratory or other controlled environment, may
entail any or all of several different techniques. Such
techniques may include, but shall not be limited to, surveying
various file "directories" and the individual files they contain
(analogous to looking at the outside of a file cabinet for the
markings it contains and opening a drawer capable of containing
pertinent files, in order to locate the evidence and
instrumentalities authorized for seizure by the warrant);
"opening" or reading the first few "pages" of such files in
order to determine their precise contents; "scanning" storage
areas to discover and possibly recover recently deleted data;
scanning storage areas for deliberately hidden files; and
performing electronic "key-word" searches through all electronic

43

storage areas to determine occurrences of language contained in
such storage areas exist that are intimately related to the
subject matter of the investigation.

Anna Brewer, Special Agent, Federal Bureau of Investigation (FBI), Omaha, Nebraska, being duly sworn, deposes and states:

1. I, Special Agent Anna Brewer, being first duly sworn, hereby depose and state as follows: I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code (USC), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated herein to include: Title 18 USC Section 371 (Conspiracy to commit offense or to defraud the United States), Title 18 USC 1952 (a) (3), (Use of Facilities in Interstate Commerce in Aid of Racketeering Enterprises), Title 18 USC Section 1952(a)(3), (Interstate transportation in aid of racketeering enterprises), Title 18 USC Section 1591 (a) (1), (Sex Trafficking), Title 18 USC 1591 (a) (2), (Financial Benefit From Sex Trafficking), and Title 18 USC Section 2422, (Coercion and Enticement to travel in Interstate Commerce with Intent to Engage in Illicit Sexual Conduct).

2. Your Affiant, Anna Brewer, is a Special Agent employed by the FBI for approximately eighteen years. Currently SA Anna Brewer is assigned to the Omaha Division. Since her transfer to Omaha, Nebraska in 2009, SA Brewer has worked on child

1

exploitation cases, sex trafficking, and interstate prostitution
cases in and about the Southern District of Iowa and the
District of Nebraska. In the last four years, in the Southern
District of Iowa and District of Nebraska, she has served/is
serving as the lead agent in approximately fifteen sex
trafficking/interstate prostitution investigations, regarding
violations of Title 18, United States Code, Sections 371, 952,
1591, 2421, and 2422, and in other investigations, including
child exploitation, regarding violations of Title 18, United
States Code, Sections 2422 and 2423, and has assisted with
additional investigations. The sex trafficking investigations in
the Southern District of Iowa over the last more than three
years have included, along with approximately eight other cases
still under investigation, three major prosecutions alleging
violations of Title 18, United States Code §§ 1591(a) and
1594(c) (sex trafficking and conspiracy to commit sex
trafficking); the Mann Act, including Title 18 United States
Code §§ 2421 and 2422 (interstate transportation for
prostitution/persuading or coercing interstate travel for
prostitution); Title 18, United States Code § 1201 (kidnaping);
the Hobbs Act, Title 18, United States Code § 1951(a)
(interstate robbery and extortion); and Title 18, United States

2

Code § 1952(a)(3)(A) (use of facilities of interstate commerce [including the internet and cell phones] in aid of racketeering). These cases have included interstate prostitution including, among others, the states of Iowa, Nebraska, Minnesota, Missouri, Kansas, Colorado, Nevada, Arkansas, Pennsylvania, South Carolina, Alabama, Georgia, Louisiana, and Texas. In three of these cases, eight defendants have been prosecuted. Of these eight defendants, six have been convicted of conspiracy to commit sex trafficking (Title 18 United States Code §§ 1594(c) and 1591(b)(1)); one convicted of interstate transportation for prostitution (Title 18, United States Code § 2421); and one is pending post-trial motions following jury verdicts of guilty on all twelve charged counts of violation of Title 18, United States Code, Sections 371, 1594(c), 1591(a)(1)-(2)/(b)(1), 2421, and 2422(a). The Task Force, of which Anna Brewer is the lead agent, also has a pending trial in the Southern District of Iowa regarding an indictment charging two persons with child exploitation in violation of Title 18, United States Code, Sections 2423(a) and 2423(e).

3. This affidavit is in support of applications for search warrants for the business identified as GOODFELLAS, located at

3

623 South 16th Street, Omaha, Nebraska, also referred to as 613 South 16th Street, Omaha, Nebraska; for LOUIS VENDITTE, his person, and vehicles associated with LOUIS VENDITTE, further described as a 2002 red Cadillac Seville SLS 4 door sedan bearing Nebraska License plate: 1-V47 Vehicle Identification Number (VIN) 1G6KS54Y22U136483 and a 2002 Chevrolet Blazer 4 door utility bearing Nebraska license: TCP-057 VIN 1GNDT13W22K150558, the VENDITTE residence located at 1526 Park Wild Avenue, Omaha, Nebraska, also identified as 1526 ½ Park Wild Avenue, Omaha, Nebraska, which includes the detached garage structure; for RUBY VENDITTE, her person, and vehicles associated with RUBY VENDITTE (vehicles described above owned and or used by RUBY and or her husband LOUIS VENDITTE), as well as computers, cell phones, and electronic devices with electronic storage capability located at these locations or on the persons of LOUIS and RUBY VENDITTE.

    4.    The locations to be searched are described in Attachment A.  The items to be seized are described Attachment B.  An internet posting that identifies Goodfellas as a "Whore House" is Attachment C.  An Internet posting detailing the rules posted online regarding the Whorehouse Challenge is Attachment D.

4

**PROBABLE CAUSE**

5.    The facts in this affidavit come from my personal
observations, my training and experience, and information
obtained from other agents, police officers, and witnesses.
This affidavit is intended to show merely that there is
sufficient probable cause for the requested warrants and does
not set forth all of my knowledge of the matter.

**INVESTIGATION**

6.    In August of 2012 the Omaha Police Department received
information that there was a business that advertised as a
"strip club in Omaha, Nebraska", yet, was a "front" for a
prostitution business/brothel.  This business was described as a
two level structure.  Investigation revealed that GOODFELLAS,
located at 623 South 16th Street, Omaha, Nebraska, also
identified as 613 South 16th Street, Omaha, Nebraska, matched
this description.  The Douglas County Assessor indicates the
location of GOODFELLAS, identified in the attached photograph A-
1, as 613 South 16th Street, Omaha, Nebraska. Through
surveillance, law enforcement has observed that the address
marked on the physical structure, identified in the attached
photograph A-1, is "623".

7.    In November 2012, the Douglas County Sheriff's Office

5

received similar information that a "brothel" was being operated at 623 South 16th Street, Omaha, Nebraska, also identified as 613 South 16th Street, Omaha, Nebraska. Since August 2012 until the present the OPD and DCSO collected information from Confidential Human Sources (CHSs) and conducted operations to collect evidence to prove that GOODFELLAS was an establishment, operated by LOUIS and RUBY VENDITTE, that engaged in interstate prostitution and that employees offered commercial sex acts to customers, some of whom traveled in interstate commerce to participate in this illegal activity. In addition, investigation conducted identified DAVID SHIRLEY (also known as "NASH" or "NASHLUV69") as a recruiter, advertiser, and promoter of this business and its illegal activities. In addition to the identification of Subjects, LOUIS and RUBY VENDITTE, and DAVID SHIRLEY, the DCSO conducted surveillance and identified the employees and clients who frequented GOODFELLAS.

8. Based on this information, in February 2013, the FBI initiated an investigation into the allegations that LOUIS and RUBY VENDITTE are engaged in a criminal enterprise to promote interstate prostitution at their business, GOODFELLAS. From investigative contacts, covert operations, Federal Grand Jury subpoenas, court ordered pen registers, court ordered GPS

6

tracking, and surveillance conducted by law enforcement, it
appears LOUIS and RUBY VENDITTE have been the operators of
GOODFELLAS in the Omaha, Nebraska, metropolitan area for a
number of years and that this business is a "front" for
prostitution. They solicit business and recruit customers
through their partner, DAVID SHIRLEY.

### Information from Omaha Police Department

9. In August, 2012, the Omaha Police Department Vice Unit
became aware, through investigation, that there are ongoing
events in the greater Omaha, Nebraska, area that are called
"Meet and Greets" (or MnG). The purpose of the "Meet and Greet"
is for clients to "Meet and Greet" prostitutes, as well as,
prostitutes "Meet and Greet" potential clients. After
attending a "Meet and Greet", a client could call and arrange to
engage in commercial sex acts with one of the prostitutes he met
at the "Meet and Greet". DAVID SHIRLEY, (White male, DOB
01/08/1964) is known by law enforcement to attend the "Meet and
Greets".

10. In addition to attending the "Meet and Greets", DAVID
SHIRLEY is vocal in an online bulletin board website known as
www.ECCIE.net (ECCIE stands for Escort Client Communication
Information Exchange). ECCIE is an online community/social

7

media website in which individuals share information about prostitution, places to go to engage in a commercial sex acts and, on occasion, members warn other members of law enforcement vice operations. DAVID SHIRLEY uses the "handle" or screen name "NASHLUV69" and is known by another nickname throughout this community as "NASH".

11. On April 9, 2012, NASHLUV69 posted a statement titled "The Whore House Challenge" (WHC) on www.ECCIE.net (See Attachment D). NASHLUV69's WHC has rules. NASHLUV69 suggests that a person wishing to participate in the WHC "Must have been to a recent M&G"; NASHLUV69 must have seen the participant at a M&G; the participant should have 4 to 5 bills ready to "spend on ho's", and that everything be kept "UTR". Your Affiant knows that "ho's" refers to prostitutes and "UTR" refers to "Under the Radar" and means readers should keep quiet as to not attract law enforcement's attention. Once the participant (client) satisfies the suggestions made by NASHLUV69 and is verified by NASHLUV69, the client can engage in illegal sex acts inside GOODFELLAS.

12. On December 22, 2012, an undercover law enforcement officer, working in an online capacity, using the screen name TRex1176, communicated with NASHLUV69 on www.ECCIE.net. In this

8

posting thread, TRex1176 states, "What's up brother! Just wanted to give you a shout and see what's up with you. It was great to finally meet you at the MnG. I had a good time finally meeting some of the people from the board, especially the ladies! Anyway, I didn't want to talk about it in front of the other guys, but I was wondering if you were still doing Nash's WH challenge? I didn't think that the MnG was the best place to discuss it, but if you are still up for it, I would be interested in visiting the fine establishment with you. I'm always up for something new.

Anyway, I hope all is well with you and that you have a great Christmas! Take care brother! TRex" (see Attachment C)

13.    In a private message on December 22, 2012 at approximately 12:50pm, NASHLUV69 posted, "It's Goodfella's Strip club at 16th & Jones. They are open from 6 to 9, Monday thru Saturday. Have fun!" (see Attachment C)

14.    In or about December 2012, an individual identified as Confidential Source (CS) #1 (hereinafter referred to as CS #1) attended a "Meet and Greet" in the Days Inn Hotel located at 11515 Miracle Hills Drive, Omaha, Nebraska. At this "Meet and Greet", CS #1 met DAVID SHIRLEY, aka, NASH, a client and a regular customer at GOODFELLAS. It was through this encounter

9

that law enforcement was able to determine that DAVID SHIRLEY is
the person who uses the screen name and aliases NASHLUV69 and
NASH.  CS #1 is a paid Confidential Human Source who has been
providing information to the Omaha Police Department for over
five years.  To the extent to which the information CS #1 has
provided can be tested, the information has been reliable.  CS
#1 has a criminal history that includes convictions for state
property crimes and traffic offenses.  CS #1 also has one
federal conviction for being a felon in possession of a firearm.

15.  On December 26, 2012, CS# 1, entered GOODFELLAS
located at 623 South 16th Street, Omaha, Nebraska, also
identified as 613 South 16th Street, Omaha, Nebraska, and met the
above mentioned "regular" customer, DAVID SHIRLEY.  After
meeting CS #1 at a "Meet and Greet", SHIRLEY "trusted" CS# 1
enough to "vouch for" CS# 1 to enter GOODFELLAS and engage in a
commercial sex act, as described immediately below.  Based on
CS#1's friendship with SHIRLEY, SHIRLEY provided a "reference"
for CS# 1.

16.  Once inside GOODFELLAS, SHIRLEY directed the CS# 1 to
a reserved table near the pool table on the North side of the
room.  SHIRLEY introduced CS# 1 to several customers and ladies
working at the bar.  SHIRLEY told the staff that CS# 1 was a

10

friend and he (CS# 1) should get the "same deals" that SHIRLEY
receives when frequenting the establishment.

17.  During this visit, which was recorded by law
enforcement, CS# 1 was able to meet two girls, one named "HOLLY"
and one named "NIKKI".  The CS# 1 mostly spoke with NIKKI who
explained that she could go (with CS# 1) to the upstairs portion
of the business in exchange for $200.00 (two hundred dollars
United States currency).  NIKKI told CS# 1 that in exchange for
$200.00 (two hundred dollars United States currency) "anything
goes" upstairs.  The CS# 1 gave NIKKI $200.00 (two hundred
dollars United States currency).  NIKKI took the money and
turned it over to a female party identified as "RUBY".  (RUBY is
known to law enforcement as RUBY VENDITTE, wife of LOUIS
VENDITTE and co-operator of GOODFELLAS)  After the transfer of
money, the CS# 1 and NIKKI went upstairs.  The sexual encounter
upstairs in GOODFELLAS was recorded.  Affiant observed this
recording which depicts a white male and a female with long hair
that matches the description, driver's license and an arrest
booking photo of MELANIE JOHNSON, in stages of undress.  The
actual sex act is not seen on the video but the following is
heard and observed by Affiant:

11

18. At 19:16 hours the white female (MELANIE JOHNSON) is observed looking around the room and on the floor under the bed. She states, "People don't know how to clean up around here they leave condom wrappers…" and at approximately 19:26 hours JOHNSON is heard discussing rubber gloves and the fact that they are "all out of condoms, apparently they went through 100 of them".

19. On January 7, 2013, CS# 1 again entered the GOODFELLAS. This visit was recorded by law enforcement. Affiant listened to the recording and heard the following: CS# 1 ordered some drinks and engaged in conversation with individuals in GOODFELLAS. At approximately 50:20 minutes into the recording, CS# 1 asked (a female who is later identified by law enforcement as MEGAN BIGELOW) if she had "time to hang out more privately?" to which BIGELOW responded (at 50:33 minutes) that it would cost $200.00 (two hundred dollars) for "all the time you want in the bedroom". At approximately 54:38 the female states, "Wanna wear a condom or not?" At approximately 55:09 the CS# 1 states, "I can get a hand job" to which the female states (at 55:14) "I give great head" and (at 54:22) that she would "lick it all the way up". At approximately 1:13:40 two adults are heard climaxing sexually and the sex acts are complete. At approximately 1:17:15 CS# 1 and BIGELOW discuss

12

the prices for two girls. BIGELOW tells CS# 1 that the usual
price would be $400.00(four hundred dollars United States
currency) but, since CS# 1 is a "friend of Dave's" (DAVID
SHIRLEY), that CS# 1 would be charged $300.00 (three hundred
dollars United States currency). BIGELOW then explains that the
price of $300.00 (three hundred dollars United States currency)
is divided, "one hundred for me, one hundred for her, and one
hundred for the house". At approximately, 1:17:38 BIGELOW says
that way, "everyone gets an even cut".

20. Prior to engaging in the above described commercial
sex act, CS# 1 reported that BIGELOW did not have any condoms to
use. Because of this, BIGELOW contacted LOUIS VENDITTE
downstairs and asked LOUIS VENDITTE to go to BIGELOW's car and
get a condom for BIGELOW to use with CS# 1. This is
corroborated by surveillance units as SERGEANT JEREMY
CHRISTENSEN and DETECTIVE BRIAN MC DOWELL observed LOUIS
VENDITTE exit GOODFELLAS Bar and walk towards a Red 1999 Ford
Ranger that was parked in the GOODFELLAS parking lot. A
Nebraska Department of Motor Vehicle (NDMV) query reveals that a
Red 1999 Ford Ranger bearing Nebraska license plate RWR 945 is
registered to DAVID SCOTT BIGELOW, residing at 6841 Mayberry,
Omaha, Nebraska and an NDMV query indicates that a Nebraska

13

Driver's license is valid and issued to MEGAN BIGELOW residing at 6841 Mayberry, Omaha, Nebraska. Law Enforcement concludes that LOUIS VENDITTE delivered the condom to BIGELOW for the commercial sex act.

21. The OPD report authored by SERGEANT JEREMY CHRISTENSEN that contains surveillance observations and a summary of the "de-briefing" of CS# 1 was reviewed by Affiant. In this report the following is documented: "At approximately 19:15 hours, R/S (Reporting Sergeant) and Officer McDowell observed a white male party wearing a white t shirt and black driver's cap exit the venue, and walk northbound to a Ford Ranger pickup, NE plate RWR 945, parked in the parking lot located to the north of the venue. R/S recognized this party as VENDITTE, Louis (dob 04 AUG 1947) who had previously been identified as the manager of Goodfellas. R/S observed VENDITTE open the passenger side door to the vehicle, retrieve and (sic) item, and go back inside the venue". In addition, regarding the commercial sex act, the R/S wrote, "The C/I advised that he was able to enter the bar and make contact with a female employee, previously identified through a driver's license photo as BIGELOW, Megan J (dob 25 JAN 1977). The C/I advised that he entered into a conversation with BIGELOW about various subjects, and at one point BIGELOW exposed

14

her bare breasts to the C/I.  The C/I also advised that BIGELOW
also displayed her naked genitals to the C/I while sitting in
the bar area.  BIGELOW then asked the C/I if he would like to go
upstairs for $200.00.  BEIGELOW advised the C/I that $200.00
gets you "all the time you want" and that "anything goes."  The
C/I agreed and gave BIGELOW $200.00 United States currency which
was provided to the C/I by the R/S.  The C/I then watched
BIGELOW approach VENDITTE, Louis and hand him the money, which
he put into his pants (sic) pocket."

### INFORMATION FROM DOUGLAS COUNTRY SHERIFF's OFFICE

22.    In a separate, parallel, investigation, on November
27, 2012, the Douglas County Sheriff Office (DCSO) received
information from a CS, (hereinafter referred to as CS# 2),
stating that a "brothel" was being operated from a business
called GOODFELLAS located at 623 South 16th Street, Omaha,
Nebraska, also identified as 613 South 16th Street, Omaha,
Nebraska. CS# 2 stated that GOODFELLAS was owned and operated by
2 (two) subjects identified as LOUIS VENDITTE (White male, date
of birth 08-04-1947) and RUBY VENDITTE (White female, date of
birth 09-01-1948) who reside at 1526 Park Wild Avenue, Omaha,
Nebraska, also identified as 1526 ½ Park Wild Avenue, Omaha,
Nebraska.  (The Douglas County Assessor indicates the VENDITTE

15

residence, identified in the attached photograph, A-2, as 1526 ½ Park Wild Avenue, Omaha, Nebraska. NCJIS indicates both LOUIS VENDITTE and RUBY VENDITTE self-report that their address is 1526 Park Wild Avenue, Omaha, Nebraska. Officers contacted O.P.P.D., which indicated that power utilities for the VENDITTE residence are in the name of LOUIS VENDITTE and RUBY VENDITTE only and have a billing address of 1526 Park Wild Avenue, Omaha, Nebraska. A photograph of the VENDITTE Residence is attached to the affidavit, identified as A-2, which photograph depicts the residence identified as both 1526 Park Wild Avenue, Omaha, Nebraska, and 1526 ½ Park Wild Avenue, Omaha, Nebraska. Through surveillance, law enforcement has observed LOUIS VENDITTE and RUBY VENDITTE park their vehicles in the driveway of the residence, identified in the attached photograph A-2 and A-3. Law enforcement officers conducting surveillance have also observed a detached garage to the rear of the residence, as identified in the attached photograph A-3. The Douglas County Assessor indicates the VENDITTE residence has a detached garage, as identified in the attached photograph A-3.) CS# 2 had this knowledge and additional information about GOODFELLAS because CS# 2 had been (and was, in November 2012, a current) an employee for LOUIS and RUBY VENDITTE at GOODFELLAS. CS# 2

16

brought this information freely and voluntarily to the DCSO. During the time DCSO operated CS #2, (November 2012 - February 2013) CS #2 was paid a total of $1,000.00 (one thousand dollars United States currency). After providing information to DCSO, on or about February 8, 2013, CS #2 entered into an agreement with the FBI to act as a Confidential Human Source. Between February 8, 2013 and present, CS #2 has been paid $1,000.00 (one thousand dollars United States currency) by the FBI for information related to this investigation. CS #2 has a criminal history that includes domestic violence, traffic, financial, and drug convictions.

23. The CS# 2 stated that LOUIS and RUBY were running a "brothel" using the night club as a front. CS# 2 stated that GOODFELLAS Night Club consisted of a seating area, a stage with a dancer pole, a bar and a kitchen area. There was an upstairs area, with access from the main floor, which included three separate rooms, 2 (two) of which are rooms which are used for commercial sex acts. The third room was used by an elderly man named John, as an office. CS# 2 also advised that the kitchen area was actually a gutted kitchen area which contained a couch and was used as an overflow "sex act" area. This gutted kitchen was used, when needed, if the two upstairs rooms were being

17

utilized by other prostitutes and "Johns" (hereinafter referred to as "clients") for sex acts.

24. According to CS# 2, there is a very limited customer list made up of long time customers, generally middle-aged to older men who frequent GOODFELLAS on a regular basis. CS# 2 can identify the "regular" customers and provide either their full names or their nicknames. DCSO Officers have corroborated these identities through surveillance and investigation.

25. Along with identifying names, CS# 2 stated that CS# 2 could identify the individual prostitutes that the clients selected on a regular basis and could identify the type of sex act that these clients regularly requested. CS #2 also identified female employees to law enforcement. These identities were also corroborated by law enforcement.

26. CS# 2 stated that unknown, non-regular customers, who enter GOODFELLAS are either run out of GOODFELLAS through a "high" (dollar amount) cover charge or by over-priced drinks of $10. When an unknown customer enters GOODFELLAS, LOUIS or RUBY will order a dancer/prostitute to get on stage to simulate dancing until the unknown customer leaves. Normally there will not be any dancers/prostitutes dancing, and, that typically the

18

dancers/prostitutes sit around until a "known" client enters GOODFELLAS.

27. CS# 2 knows through personal experiences and observation, that once a "known" client enters GOODFELLAS, the client will meet and sit down with one of the dancers/prostitutes. The dancer/prostitute and the client will negotiate a deal, which is typically an exchange of United States Currency for a sex act. The dancer/prostitute will accept the money from the client. At that point, the dancer/prostitute will hand the money over to LOUIS or RUBY VENDITTE, at which time the dancer/prostitute will escort the paid client either upstairs to one of the sex act rooms or into the back room (called the kitchen) where the sex act is consummated. After the dancer/prostitute gives RUBY or LOUIS the cash payment from the paid client, RUBY or LOUIS will split the money 50/50 with the dancers/prostitute and will place the dancer's/prostitute's money in an envelope for later retrieval. On some occasions, the envelope will be placed behind the bar for later retrieval.

28. According to CS# 2, RUBY VENDITTE keeps all the "books" (business records) in and on notebook pages. These

19

records reflect sales of drinks sold and "tricks" (commercial sex acts) turned by the girls. At the end of the evening, RUBY VENDITTE divides out the money earned by each girl and then tears the note page out and takes the page containing business records from that night home to her residence located at Park Wild Avenue, Omaha, Nebraska, also identified as 1526 ½ Park Wild Avenue, Omaha, Nebraska.

29.  CS #2 knows that RUBY VENDITTE uses a smart phone that can also be used to access the Internet and serve as a mini computer.  CS #2 has also observed laptop computers in the business and specifically recalls female employees and RUBY VENDITTE accessing the Internet through a laptop computer. Although CS #2 is unaware of all online sites visited or viewed at Goodfellas, CS #2 knows that RUBY and the female employees have accessed social media websites on these computers inside Goodfellas.

30.  During surveillances of the GOODFELLAS Night Club, which have been ongoing since at least December 26, 2012 to present, DCSO and FBI Task Force Member, Lt. SCOTT WAGNER has identified LOUIS and RUBY VENDITTE'S vehicles as the above listed "Red 2002 Cadillac Seville (Nebraska License plate: 1-

V47)" VIN 1G6KS54Y22U136483 and the "White 2002 Chevrolet Blazer
(Nebraska License plate: TCP-057)" VIN 1GNDT13W22K150558, both
of which have been observed at the GOODFELLAS Night Club and
being occupied by LOUIS and RUBY VENDITTE arriving to and
leaving from the business.

31. On September 12, 2013, pursuant to a court order
issued by the United States District Court for the District of
Nebraska, LT WAGNER initiated tracking from information provided
by devices covertly installed on LOUIS VENDITTE's 2002 Red
Cadillac Seville SLS 4 door sedan bearing Nebraska License plate
1- V47, VIN 1G6KS54Y22U136483, and LOUIS VENDITTE's 2002
Chevrolet Blazer 4 door utility bearing Nebraska license plate
TCP-057, VIN 1GNDT13W22K150558. A summary of this tracking
indicates that these vehicles travel to and from the VENDITTE
residence and GOODFELLAS. Other frequented locations are
University of Nebraska Medical Center and the three casinos in
Council Bluffs, Iowa.

32. Based on numerous surveillance reports by LT WAGNER,
and other law enforcement officers of the DCSO, to include
DEPUTY J STEHLIK and DEPUTY J MASS, physical surveillances
indicate that these above vehicles, with occupants, LOUIS and

21

RUBY VENDITTE arrive and depart GOODFELLAS parking lot, normally between the hours of 1730 hours and 2100 hours, Monday through Friday.

33. While employed at GOODFELLAS, as referenced above, CS# 2 worked with other females. CS# 2 recalled several specific females employed as "dancers/prostitutes" at GOODFELLAS for LOUIS and RUBY VENDITTE. Two of these females include MELANIE JOHNSON, 04/11/1975, and MEGAN BIGELOW 01/25/1977. CS# 2 confirmed that these females have been paid to engage in sex acts with GOODFELLAS' clients by LOUIS and RUBY VENDITTE. The females are paid by the VENDITTEs from cash proceeds collected by the girls from GOODFELLAS' clients.

34. Over the course of this investigation, LT WAGNER has also observed LOUIS and RUBY VENDITTE arrive at and depart from GOODFELLAS with female passengers.

35. Specifically, on January 17, 2013 at 20:26 hours, surveillance officers observed the Red Cadillac Seville (Nebraska License: 1-V47), occupied by LOUIS and RUBY VENDITTE, and passenger, MELANIE JOHNSON, (see paragraph 33 above) depart the GOODFELLAS parking lot after they exited the GOODFELLAS. Surveillance observed this vehicle travel in interstate commerce

22

from Omaha, Nebraska, into Council Bluffs, Iowa.  The vehicle
arrived in the area of 23rd Avenue and Avenue 'C", in Council
Bluffs, Iowa.

36.  On Tuesday, January 29, 2013 at 17:45 hours, LT WAGNER
observed the Red Cadillac Seville (Nebraska License: 1-V47),
arrive at GOODFELLAS and park in the North parking lot. LT
WAGNER observed LOUIS and RUBY VENDITTE, along with a white
female identified as MELANIE JOHNSON, exit the Red Cadillac
Seville and enter GOODFELLAS.

37. On that same day, at 2012 hours, LT WAGNER observed
LOUIS and RUBY VENDITTE, along with MELANIE JOHNSON, exit
GOODFELLAS and enter the Red Cadillac Seville.  DCSO DEPUTY J
MASS followed the Red Cadillac Seville (Nebraska License Plate
1-V47) to the area of 23rd and Avenue "C" in Council Bluffs,
Iowa, where MELANIE JOHNSON disembarked from the vehicle.

38. Investigation to date has determined that MELANIE ANN
JOHNSON, date of birth 04/11/1975, reported (in public source
records) she was living at 2310 Avenue C, Council Bluffs, Iowa,
from December 2012 to June 2013. (For information it should be
noted that JOHNSON also reported an address of 5418 N. 42nd
Street, Omaha, Nebraska, 68111 from January 2011 to July 2013,

23

and lastly JOHNSON reported an address of 5344 N. 27th Avenue, Omaha, Nebraska from February 2011 to June 2013.) JOHNSON has a criminal history that is reflected under FBI# 397344FC0 and includes: Fugitive from Justice, Theft - Nebraska, 08/25/2004; and Driving under suspension 6th - Nebraska, 11/28/2004. JOHNSON also has multiple violations on her driver's license and criminal and traffic court records. It is therefore likely that JOHNSON would require transportation traveling from her home in Council Bluffs, Iowa, to GOODFELLAS located at 624 South 16th Street, Omaha, Nebraska, to engage in commercial sex acts. And, as referenced above, JOHNSON has been observed being transported in interstate commerce by LOUIS and RUBY VENDITTE.

39. CS# 2 also stated that LOUIS VENDITTE refuses to buy liquor from a vendor and instead will bring bottles of alcohol that he purchases at a liquor store to GOODFELLAS. GOODFELLAS is a "cash only" business, that does not accept checks, nor credit cards.

40. On September 26, 2013, CS #1 met with law enforcement officers and, using recording equipment to capture conversations and video footage entered GOODFELLAS. According to the police report, at approximately 19:24 hours CS #1 met LOUIS VENDITTE at

24

the front door. They exchanged greetings, at which time, CS #1 reminded LOUIS VENDITTE that CS #1 was "NASH's friend" (DAVID SHIRLEY's friend). LOUIS VENDITTE acted as though he recognized CS #1 and walked away. CS #1 entered GOODFELLAS and sat at the bar. At 19:27 hours LOUIS VENDITTE tells CS #1 that CS #1 "just missed seeing NASH by ten minutes". CS #1 then observed LOUIS VENDITTE on the telephone nearby.

41. CS #1 initiated a conversation with the bartender. At 19:29 hours, in the midst of this conversation, LOUIS VENDITTE returned (from making a telephone call) and stated to the bartender, words to the effect, "He can have whatever he wants." CS #1 then asked the bartender who she (the bartender) would choose to "have a threesome". The bartender pointed at a blonde in GOODFELLAS. The bartender told CS #1 that it would cost $400.00 (four hundred dollars) plus a $100.00 (one hundred dollar) tip. CS #1 told the bartender that he did not have the "funds" on this particular evening to which she responded, words to the effect, "You will have fun". The CS #1 stated words to the effect, "No I do not have the 'funds'" and explained that without money, CS #1 would have to come back another day to engage in a 'three person' commercial sex act.

25

42. CS #1 purchased two drinks (one for CS #1 and one for a girl inside GOODFELLAS) and left. On the way out, at approximately 19:38 hours, CS #1 again engaged in small talk with LOUIS VENDITTE. During this conversation, LOUIS VENDITTE told CS #1 that "NASH" had just left to go to "VIP Lounge" at 90 and Center Streets, Omaha, Nebraska.

43. Your Affiant reviewed pen registers that were obtained through legal process for telephones used by LOUIS VENDITTE and determined that records reflect an outgoing call from telephone number (402) 612-9716 (a cellular telephone number used by LOUIS VENDITTE) to telephone number (402) 660-0114, (a cellular telephone number used by DAVID SHIRLEY) at 19:32:49 hours that lasted 24 (twenty four) seconds and an incoming call from (402)-660-0114 (DAVID SHIRLEY) to (402) 612-9716 (LOUIS VENDITTE) at 19:33:45 hours that lasted 52 (fifty two) seconds. Based on the time stamp on the recording from equipment used by CS #1 on September 26, 2013, these calls occurred shortly after CS #1's initial conversation with LOUIS VENDITTE. Based on my training, experience, and information gleaned through this investigation regarding how this business operates to screen clients, your Affiant concludes that LOUIS VENDITTE conferred with DAVID SHIRLEY on the identity and security (that CS #1 is a "vetted"

26

member and can receive sex acts/is not a law enforcement
officer) of CS #1.

44. Another law enforcement monitored interaction by CS #1
at GOODFELLAS occurred on October 2, 2013, at approximately
18:53 hours. After being provided recording equipment to
capture conversations, CS #1 arrived at GOODFELLAS. LOUIS
VENDITTE was observed by law enforcement officers arriving at
the same time. LOUIS VENDITTE was observed driving the White
Blazer, Nebraska license plate TCP 05, VIN 1GNDT13W22K150558.
CS #1 and LOUIS VENDITTE made contact with each other at the
front door. They exchanged greetings and both walked into
GOODFELLAS. CS #1 observed DAVID SHIRLEY, aka NASH, inside. CS
#1 walked over to DAVID SHIRLEY and engaged in conversation
about cars. A second male customer was asked to leave and a
"dancer" described as a white female with tattoos (who told CS
#1 that she was from Carter Lake, Iowa) came over to the table.
CS #1 and this female discussed commercial sex acts. CS #1 told
her that CS #1 wanted two girls and to engage in oral sex. CS
#1 told this female that CS #1 knew it would cost more than
having sex with only one girl. This female told CS #1 words to
the effect, "Let's go upstairs and have sex for $250.00" (Two
hundred and fifty dollars). CS #1 told the girl that he did not

27

have money to pay for this sex act and that he would be back the following week.

45. CS #1 gave the girl $20.00 (twenty dollars) for her time. Immediately upon giving her $20.00 (twenty dollars) LOUIS VENDITTE came over and had what CS #1 described as an "intense" discussion with the female about what had transpired. Based on CS #1's observations while in Goodfellas, it is evident to CS #1 that LOUIS VENDITTE wants to know what is going on in that club at all times in order to be aware of everything occurring at Goodfellas.

46. In addition, on October 2, 2103, during the debriefing of CS #1, CS #1 described the inside of GOODFELLAS. The CS #1 stated that upon entry there is a small island. LOUIS and RUBY VENDITTE sit in this area. There is a small table that supports computer/monitors through which LOUIS VENDITTE is able to monitor cameras that display the exterior of the building. These computer/monitors capture images of individuals and/or vehicles on the Goodfellas property and who enter and exit the business thereby identifying those who regularly patronize Goodfellas. There is a pool table. Regular customers (who are aware of the commercial sex acts) sit at two tables that are on

28

either side of the pool table. The bar consists of a seating area, a stage, a bar, and a back room in which sex acts can be performed. There was an upstairs area, with access from the main floor, which included bed rooms where the sex acts occur. On each visit, CS #1 has also observed RUBY using a laptop computer.

47. CS #1 has observed RUBY VENDITTE "split up" the money paid by clients for sex acts (between RUBY and the females).

48. On October 3, 2013, an undercover law enforcement officer (UC) entered GOODFELLAS. Upon entry, the UC observed RUBY VENDITTE sitting at "the surveillance table" (see paragraph 46 above). This table is in the middle of the bar and provides images from what appear to be two cameras focused on the outside of the business. The UC asked the bartender, who identified herself as ASHLEY LAST NAME UNKNOWN (LNU) if there was any dancing on this particular evening. ASHLEY told the UC that there were two dancers working this evening. At this point, LOUIS VENDITTE, yelled out, "Hey Morgan get your ass up there". MORGAN LNU got up on stage and danced. Sometime thereafter MORGAN sat with the UC and talked. RUBY called MORGAN away from the UC. MORGAN spoke with RUBY and returned. MORGAN told the

29

UC, words to the effect, "I'm sorry I have to go, I have a regular" and MORGAN walked over to sit with a man who had entered GOODFELLAS. During this evening both ASHLEY and MORGAN disappeared with two different men. ASHLEY and MORGAN re-appeared approximately thirty minutes later.

49. The UC sat in GOODFELLAS for approximately one hour and fifteen minutes during which time, the UC observed RUBY and LOUIS VENDITTE direct the girls. Based on the UC's observations, LOUIS and RUBY VENDITTE appeared to be in control of this business, its operation, and the employees. In addition, the UC observed that any money that was spent in GOODFELLAS "goes to RUBY". GOODFELLAS does not accept credit cards, GOODFELLAS does not ring any sales into a cash register, rather, when the UC was in the bar, all the money was turned over to RUBY.

50. Throughout the surveillances conducted by Task Force Officers, vehicles bearing license plates from surrounding states, to include Minnesota, Iowa, and Missouri, have been observed arriving, (making entry), and departing from GOODFELLAS.

30

51. In consultation with Senior FBI Special Agents whose primary responsibilities are investigating White Collar Crime, I know that businesses tend to keep records of affairs and trade in a variety of forms to include paper and electronic. I am aware that businesses keep records in secure locations, oftentimes, having the records readily accessible such as in the business itself or in a residence. As mentioned in paragraph 28, RUBY VENDITTE has been observed creating records during business hours at GOODFELLAS and taking these records home with her to her residence. RUBY has been observed as a passenger in either the 2002 Red Cadillac Seville SLS 4 door sedan bearing Nebraska License plate: 1-V47 Vehicle Identification Number (VIN) 1G6KS54Y22U136483 or the 2002 Chevrolet Blazer 4 door utility bearing Nebraska license: TCP-057 VIN 1GNDT13W22K150558.

52. From my training, experience, and personal use of hand-held electronic devices, such as cellular phones, I have learned that such devices typically store a wide variety of information, including call history logs, contact details, sent and received text messages, photographs, video, pictures, internet browsing history, and e-mail.

## **VEHICLES**

53. The Nebraska Department of Motor Vehicles records reflect that the following vehicles are registered as:

1) Red 2002 Cadillac Seville (Nebraska License plate: 1-V47), registered to RAVANITE Inc., at 623 South 16th Street, Omaha, Nebraska.

and

2) White 2002 Chevrolet Blazer (Nebraska License plate: TCP-057) VIN 1GNDT13W22K150558, registered to LOUIS A. VENDITTE

who resides at 1526 Park Wild Avenue, Omaha, Nebraska.

These vehicles have been observed being used in interstate commerce to transport employees to engage in commercial sex acts and/or have been used to transport the owners and records maintained by them to and from Goodfellas.

### **Ravanite, Inc.**

53. According to records received by law enforcement from the Nebraska Liquor Control Commission, an Application for Liquor License was received on or about October 20, 2009, from Ravanite, Inc. d/b/a Ruby's Nite Club identifying its address as 623 S. 16th Street, Omaha. The Application requested a Class C license for the on and off site sale of beer, wine and distilled spirits for the main floor of the establishment. The

32

Application indicated John W. Wagstaffe was the President of the Corporation, and Louis A. Venditte was the Secretary and Treasurer of the Corporation. The application was signed by John W. Wagstaffe, LOUIS A. VENDITTE, SR., RUBY A. VENDITTE and Amanda K. Gaffney on or about October 2, 2009 as applicants. The Application also included a Certified Copy of the Articles of Incorporation of Ravanite, Inc. filed on July 20, 2009. The Articles of Incorporation indicated the directors of the corporation as Louis A. Venditte, Jr., Christina Hanson, John Wilson Wagstaffe III, and Amanda Gaffney.

## CONCLUSION

Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that in the business of LOUIS and RUBY VENDITTE further identified as GOODFELLAS located at 623 South 16th Street, Omaha, Nebraska, also identified as 613 South 16th Street, Omaha, Nebraska, cell phones used by LOUIS VENDITTE and RUBY VENDITTE (402) 612-9716 and (402) 452-1955, or on their (LOUIS VENDITTE, RUBY VENDITTE's) person, the residence at 1526 Park Wild Avenue, Omaha, Nebraska, also identified as 1526 ½ Park Wild Avenue, Omaha, Nebraska or in vehicles associated with them: a Red 2002 Cadillac Seville (Nebraska License plate: 1-V47) and a White

33

2002 Chevrolet Blazer (Nebraska License plate: TCP-057 there

exists evidence of a crime and contraband or fruits of a crime.

Accordingly, search warrants are requested.

## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order

sealing, until further order of the Court, all papers submitted

in support of this application, including the application and

search warrant. I believe that sealing this document is

necessary because the items and information to be seized are

relevant to an ongoing investigation into the criminal

organizations as not all of the targets of this investigation

will be searched at this time. Based upon my training and

experience, I have learned that some criminals actively search

for criminal affidavits and search warrants via the internet,

and disseminate them to other criminals as they deem

appropriate, e.g., by posting them publicly online through

Internet forums. Premature disclosure of the contents of this

affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely

jeopardize its effectiveness.

I declare under penalty and perjury, that the foregoing is true

and correct to the best of my knowledge.

Executed this __9__ day of October 2013.


_____

Anna Brewer, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this __9th__ day of

October 2013.


_____

THOMAS THALKEN
UNITED STATES MAGISTRATE JUDGE
District of Nebraska

35

## ATTACHMENT A

### Places to Be Searched

1. Business identified as GOODFELLAS, located at 623 South 16th Street, Omaha, Nebraska, also identified as 613 South 16th Street, Omaha, Nebraska, further described as a two story Black colored brick building with a White sign and Red "GOODFELLAS" and Black "DANCERS" letters that sits North of Jones Street, on the East side of South 16th Street in Omaha, Nebraska. GOODFELLAS has a door facing the west side of the building. See attached photo identified as A-1.

2. The residence located at 1526 Park Wild Avenue, Omaha, Nebraska, 68108, also identified to as 1526 ½ Park Wild Avenue, Omaha, Nebraska, 68108 Street, Omaha, Nebraska further described as a reddish brick house that has a piqued roof. The house faces East but is on the West side of Park Wild Avenue, Omaha, Nebraska. The house is enclosed within a black metal fence that has a gate in front for entry to the property. The front door is covered by a roof. The second story that is visible from the street has two windows. The residence also has a detached garage to the rear. See attached photos identified as A-2 and A-3.

3. Person of RUBY VENDITTE, white female, date of birth 09/01/1948.

4. Person of LOUIS VENDITTE white male, date of birth 08/04/1947.

5. Vehicles associated with LOUIS and RUBY VENDITTE to include:
   A. Red 2002 Cadillac Seville (Nebraska License plate: 1-V47)

       VIN 1G6KS54Y22U136483

       and

   B. White 2002 Chevrolet Blazer (Nebraska License plate: TCP-

       057) VIN 1GNDT13W22K150558

6. Cellular telephones having associate numbers: (402) 612-9716 and (402) 452-1955

7. Computers, surveillance equipment, cellphones, personal data assistants and other similar handheld devices with electronic storage capability, at the locations referenced in paragraphs 1, 2, and 5(a) and (b).



NOVEMBER 2010  DOUGLAS COUNTY ASSESSOR

A-1



FEBRUARY 2012 DOUGLAS COUNTY ASSESSOR

A-2



## **ATTACHMENT B**

### **Particular Things to be Seized and Searched**

Any records utilizing the following business names: GOODFELLAS, RAVANITE, Inc.,

Records, notebooks, memoranda, receipts, ledgers, photographs, lists and employee or customer information relating to Goodfellas

Books, records, lists, receipts, bank savings and loan records of deposit, statements and other bank records, letter of credit, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, lease agreements, loan records, customer account information, financial statements, other financial records,

Personnel records for employees or contractors, including personnel lists and contact information, applications, contracts, and business records pertaining to employment of personnel,

Business records for services named in the affidavit, including records of advertisements for the business names and locations.

Personal and business financial documents including documents indicating business operations and expenses, payment for services, personal and business financial transactions, bank statements, financial statements, and payment records from clients, whether received via mail, hand delivery or electronically Business and massage licenses and certifications.

Client lists, ledgers and records, including names, contact information, records of visits and client ratings.

Calendars and appointment schedules, including paper copies and records stored electronically

Cash and other negotiable instruments

38

Towels, sheets, pillow cases, lotions, oils, customer skin care products, condoms, wrappers, containers, and similar items used to service clients, and bodily fluids

Indicia of ownership and control of the premises or vehicle, including keys, photographs, utility records, lease agreements, addressed letters and envelopes and vehicle registration

Telephone records including call activity and payment records.

Contact names and telephone numbers, e-mail and mailing addresses, dates and times of contacts, attempted contacts and missed calls, sent, received and stored text messages, voice mails and e-mails, and still photographs, video and audio files, whether stored on paper or electronically in desktop computers, laptop or notebook computers, telephone answering or recording machines, or similar electronic devices

Cellular telephones, personal data assistants and other similar handheld devices bearing the telephone number(s)(402) 612-9716 and (402) 452-1955 and all data stored in such devices, including contact names and telephone numbers, e-mail and mailing addresses, dates and times of contacts, attempted contacts and missed calls, sent, received and stored text messages, voice mails and e-mails, still photographs, video and audio files, dates, appointments and other calendar information, and GPS data

Cellular telephones, personal data assistants and other similar handheld devices and its contents

Cameras, surveillance equipment, recording equipment and monitors, photographs, video recordings, including digital photographs and video stored electronically on devices such as cameras, video recorders, compact disks and DVD's, thumb drives, flash drives, hard drives and other computer hardware.

Countersurveillance equipment, and cameras, communication and relay devices and related equipment for remote video surveillance.

39

Computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes but is not limited to any data processing devices (such as central processing units, memory, typewriters, and self-contained "desktop", "laptop", or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives, and tapes, optical storage devices, transistor-like binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, network transceivers, recording equipment, RAM or ROM units, acoustic couplets, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software can be stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operation systems, applications, utilities, compilers, interpreters, and communications programs. Any and all programs necessary for the proper functioning of the computer system.

Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items. These materials include items relating to the operation of the aforementioned hardware or peripherals.

Computer passwords and other data security devices designed to restrict access to or to hide computer software, documentation, or data: including data security devices consisting of hardware (such as encryption devices), software (such as programs that

40

encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data), and programming code (such as code that creates "hot" keys which perform security related functions when activated). Encryption keys or encryption passwords, wherever stored and on whatever medium, including paper or electronic medium.

Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals. All of the above records, whether stored on paper or magnetic media, such as tape cassette, disk, diskette, or on memory storage devices, such as optical disks, programmable instruments, such as telephone, electronic address books, calculators, or any other storage media, together with indicia of use, ownership, possession or control of such records.

Based on my knowledge and training and the experience of other agents and digital forensic experts with whom I have discussed this investigation, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a. The volume of evidence. Computer storage devices (such as hard disks, sim cards, SD cards, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information or images. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data

41

stored, and it would be impractical to attempt this kind of data
analysis on-site.

b. Technical requirements. Searching computer systems for
criminal evidence can be a highly technical process that can
require expert skills and a properly controlled environment. It
is often difficult to determine the hardware and software used
on a system to be searched before the search is executed, and
the vast array of computer hardware and software available
requires even computer experts to specialize in some systems and
applications. As a result, it is difficult to know prior to a
search: (1) whether a specific expert or search protocol may be
required; (2) if so, which expert may be qualified to analyze
the system and its data; and (3) whether and what type of
controlled environment may be required. Data search protocols
are exacting scientific procedures designed to protect the
integrity of the evidence and to recover even "hidden", erased,
compressed, password-protected, or encrypted files. Because
computer evidence can be vulnerable to inadvertent or
intentional modification or destruction (both from external
sources or from destructive code imbedded in the system as a
"booby trap"), a controlled environment may be necessary to
complete an accurate analysis. Further, such searches often
require the seizure of most or all of a computer system's
input/output peripheral devices, related software,
documentation, and data security devices (including passwords)
so that, if necessary, a qualified computer expert can
accurately retrieve the system's data in a laboratory or other
controlled environment.

Due to the volume of the data at issue and the technical
requirements set forth above, it may be necessary that the above
referenced equipment, software, data, and related instruction be
seized and subsequently processed by a qualified computer
specialist in a laboratory setting. Under appropriate
circumstances, some types of computer equipment can be more
readily analyzed and pertinent data seized on-site, thus
eliminating the need for its removal from the premises. One
factor used in determining whether to analyze a computer on-site
or to remove it from the premises is whether the computer
constitutes an instrumentality of an offense and is thus subject

42

to immediate seizure as such--or whether it serves as a mere
repository for evidence, a particular device can be more
readily, quickly, and thus less intrusively, analyzed off site,
with due considerations given to preserving the integrity of the
evidence. This, in turn, is often dependent upon the amount of
data and number of discrete files or file areas that must be
analyzed, and this is frequently dependent upon the particular
type of computer hardware involved. As a result, it is
ordinarily impossible to appropriately analyze such material
without removing it from the location where it is seized. Based
upon my knowledge, training, and the experience of other law
enforcement personnel with whom I have spoken, I am aware that
searches and seizures of evidence from computers taken from the
premises commonly require agents to seize most or all of a
computer system's input/output peripheral devices, in order for
a qualified computer expert to accurately retrieve the system's
data in a laboratory or other controlled environment. Therefore,
in those instances where computers are removed from the
premises, in order to fully retrieve data from a computer
system, investigators must seize all the magnetic storage
devices as well as the central processing units (CPUs) and
applicable keyboards and monitors which are an integral part of
the processing unit. If, after it becomes apparent that these
items are no longer necessary to retrieve and preserve the data
evidence, such materials and/or equipment will be returned
within a reasonable time.

The analysis of electronically stored data, whether performed
on-site or in a laboratory or other controlled environment, may
entail any or all of several different techniques. Such
techniques may include, but shall not be limited to, surveying
various file "directories" and the individual files they contain
(analogous to looking at the outside of a file cabinet for the
markings it contains and opening a drawer capable of containing
pertinent files, in order to locate the evidence and
instrumentalities authorized for seizure by the warrant);
"opening" or reading the first few "pages" of such files in
order to determine their precise contents; "scanning" storage
areas to discover and possibly recover recently deleted data;
scanning storage areas for deliberately hidden files; and
performing electronic "key-word" searches through all electronic

43

storage areas to determine occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.



TRex1176, Welcome back to ECCIE.net!

The time now is 03:41 PM.

**ECCIE** ESCORT CLIENT COMMUNITY INFORMATION EXCHANGE

MyFreeCams   Slxxa Gxls   MEET & FUCK   ESCORTS   SEX DATES   Adultfxx Ratings   Attract Women   One Night Stand   Massage Parlor Reviews

BROWSE SHOWCASES   SEARCH PROVIDERS   ECCIE CHAT   PREMIUM ACCESS   ADVERTISING   SEARCH

Currently Active Users: 6716 (3034 members and 3681 guests)

ECCIE Worldwide > User Control Panel > Private Messages > Inbox
**Re: Seasons Greetings**

Welcome, TRex1176- [Log Out]
You last visited: 01-04-2013 at 03:06 PM
Private Messages: Unread 0, Total 64.

| Your Control Panel | Private Message: Re: Seasons Greetings |
| --- | --- |

Your Profile
Edit Your Details
Profile Privacy
Networking
Contacts
Settings & Options
Edit Avatar
Edit Signature
Edit Email & Password
Edit Options
Edit Ignore List
Private Messages
Last Messages
Send New Message
Track Messages
Edit Folders
Subscribed Threads
List Subscriptions
Edit Folders
Miscellaneous
Event Reminders
Paid Subscriptions
Attachments

12-22-2012, 12:50 PM

**nashluv69**
Premium Access

Join Date: Nov 7, 2010
Location: Nebraska
Posts: 1,396
Reviews: 43

**Re: Seasons Greetings**

It's Goodfella's strip club at 16th & Jones. They are open from 6 to 9, Monday thru Saturday. Have fun!!

Quote:

Originally Posted by **TRex1176**
What's up brother! Just wanted to give you a shout and see what's up with you. It was great to finally meet you at the MnG. I had a good time finally meeting some of the people from the board, especially the ladies!

Anyway, I didn't want to talk about it in front of the other guys, but I was wondering if you were still doing Nash's WH challenge? I didn't think that the MnG was the best place to discuss it, but if you are still up for it, I would be interested in visiting the fine establishment with you. I'm always up for something new.

Anyway, I hope all is well with you and that you have a great Christmas! Take care brother!

TRex

_____

All statements, reviews and everything else is for amusement purposes only, YMMV. Sometimes one nut isn't enough. 😄

FORWARD   REPLY

**Quick Reply**

Message:

B I U A -

[QUOTE=nashluv69]It's Goodfella's strip club at 16th & Jones. They are open from 6 to 9, Monday thru Saturday. Have fun!!

[QUOTE=TRex1176]What's up brother! Just wanted to give you a shout and see what's up with you. It was great to finally meet you at the MnG. I had a good time finally meeting some of the people from the board, especially the ladies!

Submit Message   Go Advanced

**Message History**   View History

**Delete this Message**

Delete Message
To delete this message, check the appropriate option below and then click the 'Delete this Message' button.
☐ Delete this Message

Delete this Message

Powered by vBulletin® Version 3.8.7
Copyright ©2000 - 2013, vBulletin Solutions, Inc.

Copyright ©2009 - 2012, ECCIE Worldwide, All Rights Reserved

---- Power Blue 2012 ----

Contact Us - Terms of Service - Forum Guidelines - Top

TRexECCIE

Attachment L



TBox1176, Welcome back to ECCIE.net!

The time now is 02:41 PM.

**ECCIE** ESCORT CLIENT COMMUNITY INFORMATION EXCHANGE

MISS ADRIANNA CARTER IS A sluca GIRL!

MyFreeCams  Slixa Gals  MEET & FUCK  EROS Guide  NEBRASKA ESCORTS  SEX DATES  Adultfax Ratings  Attract Women  One Night Stand  Message Parlor Reviews

BROWSE SHOWCASES  SEARCH PROVIDERS  ECCIE CHAT  PREMIUM ACCESS  ADVERTISING  SEARCH

ECCIE Worldwide > Other US Hobby Hotspots > Nebraska > Men's Lounge (Private) - Nebraska
The Whore House Challenge!

Welcome, TBox1176. [Log Out]
You last visited: 01-04-2013 at 03:06 PM
Private Messages: Unread 0, Total 63.

**Men's Lounge (Private) - Nebraska** The Men's Lounge is a MALE-ONLY private area only accessible to our Premium Access members. Items you may not feel comfortable discussing in an open forum are more appropriately placed here. It is also the responsibility of our Premium Access members to keep this information secure. Failure to do so may result in loss of Premium Access.



>>CLICK HERE<<  Hook up with an Escort TONIGHT eros-guide.com

 MyFreeCams.com Over 1000 girls on cam, click here to watch now!

 MyFreeCams.com Watch the webcams of models and members with perfect video and audio. 

gocitypost.com EXTREMELY HOT GIRLS POST YOUR AD HERE



BANG 6 GIRLS A WEEK  This 1 Weird Trick Will... Make Women Want To Sleep With You Watch The Video >>



**Main Menu**

User CP

**Forums**
· New Posts
· Today's Posts

**SEARCH FORUMS**
**Search for Providers**

Forum Guidelines

Chat

**Premium Access**
**Advertising**

Member List
Terms of Use
Contact Us

**Send Private Message**
**Invite a Friend**

OpenAdultDirectory

Eros Guide Escorts

Eros Girls on Cam

I found Fuck Buddy!

FUCKBOOK

Live Sex

escorts in kensington

Free Escort Ads

City Girls

Attract Women

Bella Escort

Half Price Escorts

Log Out

---

REPLY

Page 1 of 3  1 2 3 >

Thread Tools ▼   Search this Thread ▼   Rate Thread ▼

04-09-2012, 09:26 AM  #1

**nashluv69**
Premium Access

Join Date: Nov 7, 2010
Location: Nebraska
Posts: 1,395
Reviews: 44

The Whore House Challenge!

Who is ready for the Whore House Challenge (WHC)? I've been getting quite a few PM's from guys wanting to expand their horizons in the UTR brothel scene. It's obvious why I can't just tell everyone, so I'm going to attempt it this way. My goal of all this is to get another long time and active member of ECCIE who will participate and verify that a true to life brothel does exist in our area (there are 2, but the other one is not for the weak at heart). Besides, WTF, it's something different.

Here's the rules (I'm making them up while typing).

1. Must have been to the recent M & G.

2. I must have seen you at the M & G.

3. Suggest having 4 to 5 bills ready to spend on ho's.
The prices run $100 to $200 a shot, so I don't know how many you want to do, but you always want to be prepared in case you want to do more. You'll get (if I can talk the madam into it) Nash's frequent flyer discount of $100 for a short time. Some idiots are paying $400 to $700 for the same service (economy ruiners).

4. I'll buy the beer. Yeah, I know I'm a good guy, lol.

5. I can't guarantee the number of gals that will be working, but it's usually between 3 to 6. It's hit or miss depending on the day.

6. Can keep everything UTR.

Anyhow, should be fun and the person will become a verified regular of the place so he will be able to call it his second home like I do, lol.

All statements, reviews and everything else is for amusement purposes only, YMMV. Sometimes one nut isn't enough.

QUOTE   MULTI-QUOTE   QUICK REPLY

---

04-09-2012, 11:39 AM  #2

**Marcus Aurelius**
Moderators just know how.

Join Date: Dec 25, 2009
Location: The North Coast
Posts: 3,318

You sir are a brave man. I would have kept this to PM's but that's just my looking over the shoulder routine.

QUOTE   MULTI-QUOTE   QUICK REPLY

---

04-09-2012, 11:42 AM  #3

**Preferred411**

PREFERRED 411

MEMBERS WELCOME

**MyProviderGuide**

myprovider Thousands of girls are online now. Post your ad



WHChallenge Fulel

Attachment D

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Nebraska

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Goodfellas business at 613/623 South 16th Street,<br>Omaha, Nebraska, Ruby Venditte, Louis Venditte, and<br>electronic equipment | )<br>)<br>)  Case No.    8:13MJ299<br>)<br>)<br>) |

SEALED

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ **Nebraska** _____
*(identify the person or describe the property to be searched and give its location)*:
Goodfellas business at 613/623 South 16th Street, Omaha, Nebraska, Ruby Venditte (her person), Louis Venditte (his person), cellular telephones, and electronic equipment, specifically identified in paragraphs 1,3,4,6,7 of Attachment A and A-1

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
                    See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    *October* 17, 2013
                                                                                                          *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
THOMAS D. THALKEN _____ .
                              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    10/9/13 @ 11:10 am                          _____
                                                                                                          *Judge's signature*

City and state:    Omaha, Nebraska _____          THOMAS D. THALKEN, U.S. Magistrate Judge
                                                                                                          *Printed name and title*

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| **Return** | | |
|---|---|---|
| *Case No.:*<br>8:13MJ299 | *Date and time warrant executed:* | *Copy of warrant and inventory left with:* |
| *Inventory made in the presence of :* | | |

*Inventory of the property taken and name of any person(s) seized:*

| **Certification** |
|---|

    *I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

*Date:* _____

                                  _____
                                    *Executing officer's signature*

                                  _____
                                    *Printed name and title*

## ATTACHMENT A

### Places to Be Searched

1. Business identified as GOODFELLAS, located at 623 South 16th Street, Omaha, Nebraska, also identified as 613 South 16th Street, Omaha, Nebraska, further described as a two story Black colored brick building with a White sign and Red "GOODFELLAS" and Black "DANCERS" letters that sits North of Jones Street, on the East side of South 16th Street in Omaha, Nebraska. GOODFELLAS has a door facing the west side of the building. See attached photo identified as A-1.

2. The residence located at 1526 Park Wild Avenue, Omaha, Nebraska, 68108, also identified to as 1526 ½ Park Wild Avenue, Omaha, Nebraska, 68108 Street, Omaha, Nebraska further described as a reddish brick house that has a piqued roof. The house faces East but is on the West side of Park Wild Avenue, Omaha, Nebraska. The house is enclosed within a black metal fence that has a gate in front for entry to the property. The front door is covered by a roof. The second story that is visible from the street has two windows. The residence also has a detached garage to the rear. See attached photos identified as A-2 and A-3.

3. Person of RUBY VENDITTE, white female, date of birth 09/01/1948.

4. Person of LOUIS VENDITTE white male, date of birth 08/04/1947.

5. Vehicles associated with LOUIS and RUBY VENDITTE to include:
   A. Red 2002 Cadillac Seville (Nebraska License plate: 1-V47)

   > VIN  1G6KS54Y22U136483

   and

   B.  White 2002 Chevrolet Blazer (Nebraska License plate: TCP-

   057) VIN 1GNDT13W22K150558

6. Cellular telephones having associate numbers: (402) 612-9716 and (402) 452-1955

7. Computers, surveillance equipment, cellphones, personal data
   assistants and other similar handheld devices with electronic
   storage capability, at the locations referenced in paragraphs
   1, 2, and 5(a) and (b).



NOVEMBER 2010 DOUGLAS COUNTY ASSESSOR

Δ-1

**ATTACHMENT B**

**Particular Things to be Seized and Searched**

Any records utilizing the following business names: GOODFELLAS, RAVANITE, Inc.,

Records, notebooks, memoranda, receipts, ledgers, photographs, lists and employee or customer information relating to Goodfellas

Books, records, lists, receipts, bank savings and loan records of deposit, statements and other bank records, letter of credit, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, lease agreements, loan records, customer account information, financial statements, other financial records,

Personnel records for employees or contractors, including personnel lists and contact information, applications, contracts, and business records pertaining to employment of personnel,

Business records for services named in the affidavit, including records of advertisements for the business names and locations.

Personal and business financial documents including documents indicating business operations and expenses, payment for services, personal and business financial transactions, bank statements, financial statements, and payment records from clients, whether received via mail, hand delivery or electronically Business and massage licenses and certifications.

Client lists, ledgers and records, including names, contact information, records of visits and client ratings.

Calendars and appointment schedules, including paper copies and records stored electronically

Cash and other negotiable instruments

Towels, sheets, pillow cases, lotions, oils, customer skin care products, condoms, wrappers, containers, and similar items used to service clients, and bodily fluids

Indicia of ownership and control of the premises or vehicle, including keys, photographs, utility records, lease agreements, addressed letters and envelopes and vehicle registration

Telephone records including call activity and payment records.

Contact names and telephone numbers, e-mail and mailing addresses, dates and times of contacts, attempted contacts and missed calls, sent, received and stored text messages, voice mails and e-mails, and still photographs, video and audio files, whether stored on paper or electronically in desktop computers, laptop or notebook computers, telephone answering or recording machines, or similar electronic devices

Cellular telephones, personal data assistants and other similar handheld devices bearing the telephone number(s) (402) 612-9716 and (402) 452-1955 and all data stored in such devices, including contact names and telephone numbers, e-mail and mailing addresses, dates and times of contacts, attempted contacts and missed calls, sent, received and stored text messages, voice mails and e-mails, still photographs, video and audio files, dates, appointments and other calendar information, and GPS data

Cellular telephones, personal data assistants and other similar handheld devices and its contents

Cameras, surveillance equipment, recording equipment and monitors, photographs, video recordings, including digital photographs and video stored electronically on devices such as cameras, video recorders, compact disks and DVD's, thumb drives, flash drives, hard drives and other computer hardware.

Countersurveillance equipment, and cameras, communication and relay devices and related equipment for remote video surveillance.

Computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes but is not limited to any data processing devices (such as central processing units, memory, typewriters, and self-contained "desktop", "laptop", or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives, and tapes, optical storage devices, transistor-like binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, network transceivers, recording equipment, RAM or ROM units, acoustic couplets, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software can be stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operation systems, applications, utilities, compilers, interpreters, and communications programs. Any and all programs necessary for the proper functioning of the computer system.

Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items. These materials include items relating to the operation of the aforementioned hardware or peripherals.

Computer passwords and other data security devices designed to restrict access to or to hide computer software, documentation, or data: including data security devices consisting of hardware (such as encryption devices), software (such as programs that

40

encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data), and programming code (such as code that creates "hot" keys which perform security related functions when activated). Encryption keys or encryption passwords, wherever stored and on whatever medium, including paper or electronic medium.

Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, software and instruction manuals. All of the above records, whether stored on paper or magnetic media, such as tape cassette, disk, diskette, or on memory storage devices, such as optical disks, programmable instruments, such as telephone, electronic address books, calculators, or any other storage media, together with indicia of use, ownership, possession or control of such records.

Based on my knowledge and training and the experience of other agents and digital forensic experts with whom I have discussed this investigation, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a. The volume of evidence. Computer storage devices (such as hard disks, sim cards, SD cards, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information or images. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data

stored, and it would be impractical to attempt this kind of data analysis on-site.

b. Technical requirements. Searching computer systems for criminal evidence can be a highly technical process that can require expert skills and a properly controlled environment. It is often difficult to determine the hardware and software used on a system to be searched before the search is executed, and the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. As a result, it is difficult to know prior to a search: (1) whether a specific expert or search protocol may be required; (2) if so, which expert may be qualified to analyze the system and its data; and (3) whether and what type of controlled environment may be required. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Because computer evidence can be vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that, if necessary, a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

Due to the volume of the data at issue and the technical requirements set forth above, it may be necessary that the above referenced equipment, software, data, and related instruction be seized and subsequently processed by a qualified computer specialist in a laboratory setting. Under appropriate circumstances, some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject

42

to immediate seizure as such--or whether it serves as a mere
repository for evidence, a particular device can be more
readily, quickly, and thus less intrusively, analyzed off site,
with due considerations given to preserving the integrity of the
evidence. This, in turn, is often dependent upon the amount of
data and number of discrete files or file areas that must be
analyzed, and this is frequently dependent upon the particular
type of computer hardware involved. As a result, it is
ordinarily impossible to appropriately analyze such material
without removing it from the location where it is seized. Based
upon my knowledge, training, and the experience of other law
enforcement personnel with whom I have spoken, I am aware that
searches and seizures of evidence from computers taken from the
premises commonly require agents to seize most or all of a
computer system's input/output peripheral devices, in order for
a qualified computer expert to accurately retrieve the system's
data in a laboratory or other controlled environment. Therefore,
in those instances where computers are removed from the
premises, in order to fully retrieve data from a computer
system, investigators must seize all the magnetic storage
devices as well as the central processing units (CPUs) and
applicable keyboards and monitors which are an integral part of
the processing unit. If, after it becomes apparent that these
items are no longer necessary to retrieve and preserve the data
evidence, such materials and/or equipment will be returned
within a reasonable time.

The analysis of electronically stored data, whether performed
on-site or in a laboratory or other controlled environment, may
entail any or all of several different techniques. Such
techniques may include, but shall not be limited to, surveying
various file "directories" and the individual files they contain
(analogous to looking at the outside of a file cabinet for the
markings it contains and opening a drawer capable of containing
pertinent files, in order to locate the evidence and
instrumentalities authorized for seizure by the warrant);
"opening" or reading the first few "pages" of such files in
order to determine their precise contents; "scanning" storage
areas to discover and possibly recover recently deleted data;
scanning storage areas for deliberately hidden files; and
performing electronic "key-word" searches through all electronic

43

storage areas to determine occurrences of language contained in
such storage areas exist that are intimately related to the
subject matter of the investigation.